1

HONORABLE RONALD B. LEIGHTON

2

3

4

5

6

UNITED STATES DISTRICT COURT
7

WESTERN DISTRICT OF WASHINGTON
AT TACOMA

8

DAVID V. THEM and KATHLEEN A.          CASE NO. 3:19-cv-06034-RBL
9
THEM, husband and wife,

ORDER ON PLAINTIFFS' MOTION
10            Plaintiff,                  FOR PARTIAL SUMMARY
         v.                              JUDGMENT
11

MANHATTANLIFE ASSURANCE
12
COMPANY OF AMERICA, a foreign
13   insurance company,

Defendant.
14

15                              **INTRODUCTION**

16        THIS MATTER is before the Court on Plaintiffs David and Kathleen Them's Motion for

17   Partial Summary Judgment. Dkt. # 28. The Thems sued their insurer, Defendant ManhattanLife

18   Assurance Company of America, after it declined to cover Kathleen Them's May 2018 back

19   surgery. The Thems now seek summary judgment regarding liability on their claims for breach

20   of contract, negligence, bad faith, and violations of Washington's Insurance Fair Conduct Act

21   (IFCA) and Consumer Protection Act (CPA). For the following reasons, the Court DENIES their

22   Motion.

23

24

## BACKGROUND

On February 26, 2018, Kathleen Them fell during physical therapy for her foot and sustained an injury to her lower back. Kathleen Them Dec., Dkt. # 30. By all indications, this injury severely impacted Mrs. Them's mobility and caused her great pain. She underwent vertebral augmentation surgery for L1 and L3 compression fractures at Swedish Medical Center Cherry Hill on May 2, 2018. *Id*.

At the time, the Thems were insured under a Hospital Confinement and Other Fixed Indemnity Insurance Policy, Policy No. 72-486507, issued by ManhattanLife that took effect on October 10, 2017. Policy, Dkt. # 38, Ex. 1, at 5 of 66. On May 24, ManhattanLife acknowledged receipt of a bill from Swedish for $65,684.00 for Kathleen Them's surgery. Dkt. # 29, Ex. E. On July 3, the Thems received an Explanation of Benefits from ManhattanLife stating that it had requested medical records related to the May 2 surgery. Dkt. # 29, Ex. C.

The Thems contacted ManhattanLife repeatedly to facilitate the claim assessment process. Dkt. # 29, Ex. F. Judging by the email correspondence between Mr. Them and ManhattanLife, there were some issues obtaining medical records and ManhattanLife sent one request to a wrong address. Dkt. # 29, Ex. I. The last records were faxed to ManhattanLife on July 25. Dkt. # 29, Ex. J. ManhattanLife denied Mrs. Them's claim on August 28, stating simply: "This condition is pre-existing and not covered under your policy. Please refer to your policy for information regarding limitations for pre-existing conditions." Dkt. # 29, Ex. K. The Policy states:

> **Pre-Existing Conditions Limitation**: We will not pay benefits for events that result from or are related to a Pre-Existing Condition, or its complications, until the Covered Person has been continuously insured under this Policy for 12 months. After this period, benefits will be available for Covered Events resulting from or related to a Pre-Existing Condition, or its complications, provided that the

1    Covered Event occurs while this Policy is in force.

2    Dkt. # 38, Ex. 1, at 27. The Policy defines a "Pre-Existing Condition" as:

3    A condition and related complications:

4    1.   For which medical advice or treatment was sought, received or recommended from a
          provider during the 12-month period immediately prior to the Covered Person's
5         Effective Date; or

6    2.   That produced symptoms during the 12-month period immediately prior to the
          Covered Person's Effective Date which reasonably should have caused or would have
7         caused an ordinarily prudent person to seek diagnosis, care, or treatment.

8    *Id*. at 23.

9         The Thems appealed the denial on October 2, 2018 and submitted letters from Mrs.

10   Them's doctors. Dkt. # 29, Ex. I, at 02170. Dr. Glen David, who treated Mrs. Them at Swedish

11   Neuroscience Institute, stated, "It's impossible to know exactly when compression fractures

12   occur, however given the new acute onset of pain over these levels after the incident on 02/27/18

13   it is reasonable to conclude that these fractures likely occurred during this incident." Dkt. # 29,

14   Ex. M. Dr. Madan Rao, Mrs. Them's former chiropractor, stated in a letter that Mrs. Them had

15   come to their office in 2012 with lower back pain but had largely regained her mobility through

16   therapy. Dkt. # 29, Ex. L. Dr. Rao's officer had "never diagnosed nor treated her for vertebral

17   fractures, osteoporosis, osteopenia, or any other type of bone destructive condition." *Id*.

18        However, records from Mrs. Them's April 17, 2018 consultation at Swedish note "fairly

19   advanced, generalized osteopenia, probably from osteoporosis." Dkt. # 38, Ex. 4, at 7 of 8. The

20   Vancouver Clinic, which Mrs. Them visited after her surgery, also diagnosed a "fracture of

21   vertebra due to osteoporosis." Dkt. # 38, Ex. 3., at 6 of 20. Records from Rao Family

22   Chiropractic indicate that Mrs. Them had made over 80 visits since 2012, most recently on

23   October 19, 2017 when she rated her pain at "0-2." Dkt. # 38, Ex. 2, at 105. Despite this apparent

24

1    progress in pain and functionality, she was still diagnosed with "Lumbar Spine Segmental

2    Dysfunction," "Segmental and Somatic Dysfunction of Lower Extremity," and "Spasm of Back."

3    *Id*.

4         Mr. Them remained in frequent contact with ManhattanLife via email and phone during

5    the appeal process. Dkt. # 29, Exs. I, N. On October 24, Claims Manager Orion Burroughs

6    informed Mr. Them that ManhattanLife had not heard back from Dr. David's office but had

7    forwarded the claim and accompanying documents to the company's in-house hospitalist, Dr.

8    Eduardo Mora. Dkt. # 29, Ex. I, at 22 of 38. On November 1, Burroughs emailed Dr. Mora and

9    asked him to determine if Mrs. Them's February 2018 injury was new or a continuation of her

10   preexisting back problems. Dkt. # 29, Ex. N, at 22 of 22. Dr. Mora responded on November 7:

> This event is fully documented in the Medical Incident Report of 02/26/2018.
> Same day an X-ray of lumbar area failed to show any lumbar spine injury, but
> next day MRI evidenced an older fracture and a newer fracture by compression.
> Another report gave the diagnoses of fracture of vertebra due to osteoporosis, but
> also gave the contradicting diagnosis of age related osteoporosis without current
> pathological fracture.
>
> Whether or not [it] is a pathological fracture, we know that there was a new event
> on 02/26/2018 and one of the lesions was a newer compression fracture. We can
> consider the last injury as a not pre-ex condition.

16   *Id*. at 21. On November 21, Burroughs emailed three other claims employees and stated that

17   ManhattanLife should "go ahead and overturn the prior denial of these claims based off of Dr.

18   Mora's Response . . . ." *Id*.

19        However, one of those employees, Kisha Daughtery, followed up with Dr. Mora on

20   November 13 to ask whether Mrs. Them's surgery was "necessary" due to her new injury or

21   could have "help[ed] with her prior back pain that has been documented since 2012?" *Id*. Dr.

22   Mora responded, "As per the notes below, this lady has an acute fracture of L3. . . . Certainly she

23   has multiple chronic sub-acute and chronic injuries in her lumbar spine, in addition to

1   osteoporosis that makes she [sic] prone to new fractures, including pathological fractures." *Id*. at

2   20.

3        Daughtery interpreted Dr. Mora's email to mean that, "although the L3 fracture may have

4   been new, Mrs. Them had other multiple chronic problems which also contributed to the fracture

5   and the need for the surgery." Daughtery Dec., Dkt. # 37, at 3. Another claims manager, Reeta

6   Chhabra, sent an email on November 26 interpreting Dr. Mora's response to imply that the L3

7   fracture was new and that ManhattanLife should therefore "pay the claim." Dkt. # 29, Ex. N, at

8   20. But the next day, Burroughs sent out an email citing Mrs. Them's chiropractic records and

9   pointing out that Mrs. Them had answered "no" to the application question of whether she had

10  been treated by a physician in the past 12 months. *Id*. at 19.

11       Daughtery states that the group reached a consensus thereafter that the claim was not

12  covered and affirmed the denial on November 27. Daughtery Dec., Dkt. # 37, at 3. The email to

13  the Thems cited Mrs. Them's prior treatment for "low back pain, degenerative changes of the

14  lower lumbar spine, and Lumbar Spine segmental Dysfunction" during the Policy's pre-existing

15  condition exclusion period. Dkt. # 29, Ex. O, at 24 of 48.[1]

16                                    **DISCUSSION**

17       Summary judgment is proper "if the pleadings, the discovery and disclosure materials on

18  file, and any affidavits show that there is no genuine issue as to any material fact and that the

19  movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether

20  an issue of fact exists, the Court must view all evidence in the light most favorable to the

21

22  _____

    [1] ManhattanLife calculates a maximum payout of $5,123.00 in benefits for Mrs. Them's back
23  surgery and related costs if coverage did apply. Blakey Dec., Dkt. # 33, at 2. In December 2018,
    the Thems received 100% financial assistance discount from Swedish for services from May 2 to
24  June 25, 2018. Dkt. # 36, Ex. 1.

1  nonmoving party and draw all reasonable inferences in that party's favor. *Anderson Liberty*

2  *Lobby, Inc.*, 477 U.S. 242, 248-50 (1986) (emphasis added); *Bagdadi v. Nazar*, 84 F.3d 1194,

3  1197 (9th Cir. 1996). A genuine issue of material fact exists where there is sufficient evidence

4  for a reasonable factfinder to find for the nonmoving party. *Anderson*, 477 U.S. at 248. The

5  moving party bears the initial burden of showing that there is no evidence which supports an

6  element essential to the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

7  Once the movant has met this burden, the nonmoving party then must show that there is a

8  genuine issue for trial. *Anderson*, 477 U.S. at 250.

9  **1.     Breach of Contract**

10   "Interpretation of an insurance contract is a question of law." *Woo v. Fireman's Fund*

11  *Ins. Co.*, 161 Wash. 2d 43, 52 (2007). Terms are to be interpreted as the "average person

12  purchasing insurance" would understand them. *Id*. "The courts liberally construe insurance policies

13  to provide coverage whenever possible." *Bordeaux, Inc. v. American Safety Ins. Co.*, 145 Wn. App.

14  687, 694, 186 P.3d 1188 (2008) (citing *Riley v. Viking Ins. Co. of Wisconsin*, 46 Wn. App. 828).

15  Consistent with this, any ambiguities are construed in the manner most favorable to the insured.

16  *Findlay v. United Pac. Ins. Co.*, 129 Wn.2d 370, 374 (1996). While the insured has the burden of

17  proving that claims fall within a grant of coverage, the insurer has the burden of proving that an

18  exclusion bars coverage. *See McDonald v. State Farm Fire & Cas. Co.*, 119 Wn.2d 724, 731

19  (1992).

20   Here, the Thems have failed to carry their initial burden that coverage exists and

21  ManhattanLife has presented a material dispute of fact about whether the Pre-Existing Condition

22  Limitation bars coverage. The Thems take it for granted in their Motion that coverage exists and

23  rush ahead to argue about ManhattanLife's unreasonable denial. But the Court cannot simply

24

1   skip the initial step of confirming that coverage exists absent that limitation. The Thems do not

2   even quote the Policy's language in their Motion.

3       But even without this misstep, the evidence viewed favorably toward ManhattanLife

4   could support a verdict in its favor. The Policy's Pre-Existing Condition Limitation excludes

5   "benefits for events that result from or are *related to* a Pre-Existing Condition, or its

6   complications." Dkt. # 38, Ex. 1, at 27 (emphasis added). While the term "result from" implies a

7   direct causal relationship between the pre-existing condition and the event, "related to" is

8   broader. A reasonable jury could find that Mrs. Them's surgery was "related to" a pre-existing

9   medical condition based on that term's plain meaning, which merely denotes a "connect[ion]"

10  between two things.[2] *See* MERIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/

11  dictionary/related%20to (last visited: Aug. 18, 2020).

12      Specifically, there is a dispute of material fact regarding whether Mrs. Them's

13  preexisting back issues contributed to at least one of her vertebral fractures. While Dr. Rao stated

14  that she was never diagnosed with a "bone destructive condition," Dkt. # 29, Ex. L, Dr. Mora

15  stated that one of her fractures was preexisting and suggested that her prior back problems

16  contributed to her February 2018 injury. Dkt. # 29, Ex. N, at 20. Neither party provides a more

17  detailed medical analysis of whether Mrs. Them's prior back conditions could have predisposed

18  her to vertebral fractures or exacerbated the impact of such fractures. Because there is at least

19  some evidence on both sides of the issue, the Court cannot decide it as a matter of law at this

20  time.

21

22

23  _____

    [2] Notably, neither party offers an interpretation of the Policy's pre-existing condition limitation
    or analyzes its proper scope. This is another reason that granting summary judgment would be
24  inappropriate at this time.

ORDER ON PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT - 7

1	There is more evidentiary support for the proposition that Mrs. Them's osteoporosis

2	caused her fracture. Dkt. # 38, Ex. 3., at 6 of 20. However, it is unclear whether this condition

3	was previously treated or symptomatic, as required under the definition of "pre-existing

4	condition." *See* Dkt. # 38, Ex. 1, at 23. ManhattanLife has requested additional discovery to

5	explore this issue and others, and the Court agrees that this would be beneficial.

6	The Thems place much emphasis on the two emails from Burroughs and Chhabra opining

7	that ManhattanLife should overturn the denial based on Dr. Mora's opinions. Dkt. # 29, Ex. N, at

8	20-21. However, while these communications show that the claims staff was not always in

9	agreement, they do not establish unequivocally that Mrs. Them's claim was covered.

10	ManhattanLife's ultimate decision to affirm the denial was based on Dr. Mora's second email,

11	closer scrutiny of Policy language, and a re-examination of Mrs. Them's medical records. *See*

12	Daughtery Dec., Dkt. # 37, at 2-3. The fact that certain employees changed their opinions is not

13	conclusive proof that ManhattanLife's denial was incorrect.

14	**2.	Unreasonable or Unfair Denial of Coverage**

15	Insurers owe their insureds a duty of good faith and fair dealing, which is "akin to a

16	fiduciary duty." *St. Paul Fire & Marine Ins. Co. v. Onvia, Inc.*, 165 Wash. 2d 122, 129 (2008).

17	An insured may breach this duty and become liable for bad faith through "unreasonable,

18	frivolous, or unfounded" conduct. *Id*. Similarly, under IFCA, an insured "who is unreasonably

19	denied a claim for coverage or payment of benefits by an insurer" may recover actual damages

20	and costs, among other remedies. RCW 48.30.015(1); *see also Perez-Crisantos v. State Farm*

21	*Fire & Cas. Co.*, 187 Wn.2d 669 (2017). The CPA prohibits "unfair or deceptive act[s] or

22	practice[s]," including bad faith denial of an insurance claim. *Hangman Ridge Training Stables,*

23	*Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 780 (1986). Finally, an insurer can negligently

24

ORDER ON PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT - 8

1    handle an insured's claim by failing to apply ordinary care.[3] *Merriman v. Am. Guarantee &*

2    *Liab. Ins. Co.*, 198 Wash. App. 594, 616 (2017). "Whether an insurer acted in bad faith is a

3    question of fact." *Onvia, Inc.*, 165 Wash. 2d at 130.

4         Here, for reasons already discussed regarding breach of contract, the Thems have not

5    demonstrated that ManhattanLife unreasonably denied them coverage in bad faith or failed to

6    exercise ordinary care. It is not clear that their claim was covered. Even if it was,

7    ManhattanLife's internal communications reveal issues of fact regarding whether the denial was

8    done arbitrarily and in bad faith.

9    **3.      Inadequate Investigation and Claims Handling**

10        "[A]n insured may maintain an action against its insurer for bad faith investigation of the

11   insured's claim and violation of the CPA regardless of whether the insurer was ultimately correct

12   in determining coverage did not exist." *Coventry Assocs. v. Am. States Ins. Co.*, 136 Wash. 2d

13   269, 279 (1998). If the insurer fails to "fully and fairly investigate the claim," it has breached its

14   duty of good faith to the insured. *Id.* However, the insured must separately prove that this

15   conduct caused harm. *Id.* at 281.[4]

16        Plaintiffs also cite the following insurance regulations as supporting *per se* violations of

17   the CPA: WAC 284-30-330(1) (prohibiting "[m]isrepresenting pertinent facts or insurance policy

18   provisions"); WAC 284-30-330(5) (prohibiting "[f]ailing to affirm or deny coverage of claims

19   within a reasonable time after fully completed proof of loss documentation has been submitted");

20   _____

21   [3] Although the analysis for bad faith and negligence are "essentially the same, . . . a party may
     fail to use ordinary care yet still not act in bad faith" *Naxos, LLC v. Am. Family Ins. Co.*, No.
     C18-1287JLR, 2020 WL 777260, at *23 (W.D. Wash. Feb. 18, 2020).

22
     [4] The Thems' Motion suggests that their negligence claim may address ManhattanLife's
23   investigation generally, but the Amended Complaint confines the negligence claim to
     unreasonable denial of coverage. Dkt. # 24 at 3. The Court will therefore not discuss negligence
24   in this section.

1   WAC 284-30-370 ("Every insurer must complete its investigation of a claim within thirty days

2   after notification of claim, unless the investigation cannot reasonably be completed within that

3   time."); WAC 284-30-330(3) (prohibiting "[f]ailing to adopt and implement reasonable

4   standards for the prompt investigation of claims arising under insurance policies"); WAC 284-

5   30-330(13) (prohibiting "[f]ailing to promptly provide a reasonable explanation of the basis in

6   the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer

7   of a compromise settlement").

8           The Thems argue that ManhattanLife unreasonably investigated their claim and violated

9   the aforementioned regulations by (1) failing to inform the Thems of Dr. Mora's initial

10   conclusion that Mrs. Them's injury was not a pre-existing condition, (2) misrepresenting the

11   timing of communications with Dr. Mora, (3) failing to resolve the Thems' claim in a timely

12   fashion within 30 days, (4) failing to maintain written standards for the handling of insurance

13   benefits claims, and (5) failing to adequately explain the reasons for denying the Thems' claim

14   based on the pre-existing condition limitation.

15           While the Thems identify some inadequacies in how ManhattanLife handled their claim,

16   this is not enough to establish bad faith investigation as a matter of law. Regarding the WACs,

17   the Thems present no authority dictating that ManhattanLife's failure to apprise the Thems of Dr.

18   Mora's initial email amounted to a misrepresentation and do not explain why the timing of

19   communications with Dr. Mora is a "pertinent fact." WAC 284-30-330(1). The Thems also do

20   not demonstrate that lack of written standards amounts to maintaining unreasonable standards.

21   *See Merrill v. Crown Life Ins. Co.*, 22 F. Supp. 3d 1137, 1149 (E.D. Wash. 2014) ("Plaintiff has

22   offered no authority for the proposition that an insurer must adopt a claims manual or create a

23   'checklist' to satisfy this regulation.").

24

1    The Thems make a better case that ManhattanLife's denials were untimely and

2  inadequately explained. ManhattanLife seemingly had all of Mrs. Them's medical records by

3  July 25 but failed to render a decision until August 28, over 30 days later. ManhattanLife

4  presents no excuse for this beyond the supposed complexity of Mrs. Them's records.

5  ManhattanLife's denial of the claim also contained nothing beyond a cursory citation to the

6  Policy and did not relate the denial to the facts of Mrs. Them's case.

7    However, the Court declines to rule on these issues as a matter of law because the Thems

8  have not demonstrated that they caused harm independent of the underlying coverage denial. *See*

9  *New York Life Ins. Co. v. Powell*, No. 12-CV-5184-RBL, 2012 WL 4868008, at *4 (W.D. Wash.

10  Oct. 12, 2012) (a bad faith investigation must cause harm). A CPA violation requires injury to

11  "business or property," a category that does not include emotional distress and anxiety. *Stephens*

12  *v. Omni Ins. Co.*, 138 Wash. App. 151, 180, 159 P.3d 10, 25 (2007). The requirement is met

13  when the "consumer's property interest or money is diminished because of the unlawful

14  conduct," *Id*., but the Thems do not explain how the delay in claim processing and cursory

15  explanation in particular satisfy this. Instead, they broadly assert that they "incur[red] time and

16  expense as a result of the unfair act or practice in issue." Motion, Dkt. # 28, at 12. This

17  conclusory statement does not suffice for summary judgment.

**CONCLUSION**

19    For the above reasons, the Court DENIES the Thems' Motion for Partial Summary

20  Judgment.

21  / /
    /

1

IT IS SO ORDERED.

2

Dated this 20th day of August, 2020.

3

4

Ronald B. Leighton
United States District Judge

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

ORDER ON PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT - 12